UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**TORRIE L. MERRIAM**,                                    Civil Case No. 3:10-CV-6405-KI

                     Plaintiff,

                                 OPINION AND ORDER

               v.

**MICHAEL J. ASTRUE**,
Commissioner of Social Security,

                     Defendant.


      Kathryn Tassinari
      Robert A. Baron
      Harder, Wells, Baron & Manning, P.C.
      474 Willamette, Suite 200
      Eugene, Oregon  97401

          Attorneys for Plaintiff

S. Amanda Marshall
United States Attorney
District of Oregon
Adrian L. Brown
Assistant United States Attorney
1000 SW Third Avenue, Suite 600
Portland, Oregon  97201-2902

Jeffrey R. McClain
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, Washington  98104-7075

       Attorneys for Defendant


KING, Judge:

Plaintiff Torrie Merriam brings this action pursuant to section 205(g) of the Social

Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the

Commissioner denying plaintiff's application for disability insurance benefits ("DIB") and

supplemental security income benefits ("SSI").  I affirm the decision of the Commissioner.

## BACKGROUND

Merriam filed applications for DIB and SSI on October 10, 2007, alleging disability as of

May 23, 2006.  The applications were denied initially and upon reconsideration.  After a timely

request for a hearing, Merriam, represented by counsel, appeared and testified before an

Administrative Law Judge ("ALJ") on February 19, 2010.

On March 26, 2010, the ALJ issued a decision finding that Merriam was not disabled

within the meaning of the Act and therefore not entitled to benefits.  This decision became the

final decision of the Commissioner when the Appeals Council declined to review the decision of the ALJ on October 1, 2010.

### DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1). In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act. 42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability. The evaluation is carried out by the ALJ. The claimant has the burden of proof on the first four steps. Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007), cert. denied, 128 S. Ct. 1068 (2008); 20 C.F.R. §§ 404.1520 and 416.920. First, the ALJ determines whether the claimant is engaged in "substantial gainful activity." If the claimant is engaged in such activity, disability benefits are denied.

Page 3 - OPINION AND ORDER

Otherwise, the ALJ proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c) and 416.920(c). If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the ALJ proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d) and 416.920(d). If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is presumed to be disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past. If the claimant is able to perform work she performed in the past, a finding of "not disabled" is made and disability benefits are denied. 20 C.F.R. §§ 404.1520(e) and 416.920(e).

If the claimant is unable to perform work performed in the past, the ALJ proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his age, education, and work experience. The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities. Parra, 481 F.3d at 746. The claimant is entitled to disability benefits only if he is not able to perform other work. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards. Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005). Substantial evidence is more than a "mere scintilla" of the evidence but less than a preponderance. Id. "[T]he Commissioner's findings are upheld if supported by inferences reasonably drawn from the record, and if evidence exists to support more than one rational interpretation, we must defer to the Commissioner's decision." Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1193 (9th Cir. 2004) (internal citations omitted).

## THE ALJ'S DECISION

The ALJ found Merriam had the severe impairments of major depressive disorder, PTSD, personality disorder NOS, mild lumbar spondylosis, left ulnar mononeuropathy, early matatarsalgia, asthma, and history of seizure disorder. The ALJ found that these impairments, either singly or in combination, did not meet or medically equal the requirements of any of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1.

The ALJ concluded that Merriam had the residual functional capacity ("RFC") to lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk six hours in an eight hour workday, and sit six hours in an eight hour workday. He found Merriam to be limited to occasional use of foot controls bilaterally, with only occasional ladder, rope and scaffold climbing. She should avoid moderate exposure to pulmonary irritants and concentrated exposure to workplace hazards. She was limited to performing simple, repetitive tasks consistent with unskilled work in an environment with minimal changes. Finally, he concluded Merriam should

have limited contact with the general public and her contact with coworkers and/or supervisors should be restricted to only work-related issues.

Based on this RFC, and relying on the testimony of a vocational expert ("VE"), the ALJ believed Merriam could work as a fruit sorter, stuffer, or small parts assembler.

## FACTS

Merriam, a 34-year old with a GED at the time of her alleged onset of disability, identified a seizure disorder, hypertension, sleep apnea, a head injury, and memory loss as the reasons for her inability to work. Her most recent job, which lasted from 2004 to May 2006, was working as a night clerk at a motel where she was responsible for bookkeeping tasks; her mother was her manager. Merriam also had prior work experience at a bowling alley, performing customer service, cashier and bookkeeping tasks there for five years. She was fired due to theft allegations.

A neurologist in 1999 referred Merriam to obtain an EEG after she reported experiencing a "generalized convulsive seizure in May of 1999." The test results were normal, reflecting "no evidence of a focal lateralized or epileptiform abnormality." Tr. 464.

Merriam received treatment after a car accident in 2004. The accident happened when she began merging into the lane to her right, from a complete stop, and was hit by a Chevy Astro van. Her airbag deployed. She went to the emergency room complaining about pain in her feet, tailbone and hips. Notably, she made no allegation of being hit in the face or head. She subsequently received care for low back pain, and finger and left forearm numbness and tenderness.

Page 6 - OPINION AND ORDER

Merriam obtained treatment for seizures on four occasions in July and August 2006, then again on November 27 and December 12, 2006. During the August 2006 visit, George A. Palmer, M.D., opined that "none of the events she describes today are epileptic," and he believed the "emotional seizures" she described experiencing during family disputes were actually panic attacks. Tr. 250.

On February 21, 2007, Travis Owens, Psy.D., examined Merriam and diagnosed Major Depressive Disorder, Severe with Psychotic Features; Bereavement; Cannabis Abuse; Obsessive-Compulsive Disorder (Provisional), and a Rule Out diagnosis of Bipolar Disorder. She tested with a low average IQ. She reported her disability as seizures, depression, herniated disc, loss of rotation in right shoulder, and fracture in her right hip; she reported her disability first became noticeable when she had her first seizure at 14 months old. She used marijuana for pain in her face when an airbag struck her in the face during the 2004 car accident. Dr. Owens opined that Merriam had a mild limitation in social interactions, marked impairment in daily activities, mild impairment in understanding, remembering and carrying out simple instructions, and moderate impairment in understanding, remembering and carrying out complex instructions. Dr. Owens believed Merriam demonstrated moderate to marked impairment in responding appropriately to coworkers, supervisors, and the public, while her ability to maintain attention, concentration, persistence and pace was only mildly impaired. Dr. Owens assigned a GAF of 35.[1]

---

[1]The GAF is a scale from 1-100, in ten point increments, that is used by clinicians to determine the individual's overall functioning. A GAF of 31 to 40 means "**Some impairment in reality testing or communication** (e.g., speech is at times illogical, obscure, or irrelevant) **OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood** (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th

She obtained treatment for seizures from Thomas Hankins, M.D., reporting on February 26, 2007 that she was "100% disabled due to GM seizure disorder." Tr. 272. She saw Dr. Hankins for seizures again on April 6, 2007. On July 3, 2007, she reported to Dr. Hankins for "seizure disorder" to "demonstrate her need for continued disability." Tr. 259. Dr. Hankins found Merriam lying on the exam table "producing tonic clonic voluntary muscle activity and declining to respond to verbal questions." Id. There was no "prodrome and no post ictal period." Id. She was talking within thirty seconds about her lack of money and breaking up with her boyfriend. She reported her seizures started in 1999. In response to Dr. Hankins' question about whether she had a driver's license, Merriam told him a friend had driven her and would drive her home. He and three of the staff watched her drive away in her car. He diagnosed her with Factitious Disorder[2] with Psychiatric Signs/Symptoms, Drug Abuse in remission, Cannabis Abuse, and Depression NOS. She saw Dr. Hankins again "for disability paperwork" and a cough in August 2007. Tr. 257.

She attended therapy sessions somewhat sporadically at Douglas County Mental Health Center from December 2007 to December 2008. She attended either a group or an individual session on 22 occasions during those years, but missed 35 sessions.

Her neurologist, Jerry D. Boggs, M.D., reviewed EEG test results in February 2008 and concluded there was no evidence of seizure activity or epilepsy. Merriam acknowledged

ed. 2000) ("DSM-IV").

[2]Factitious disorder, also known as Munchausen syndrome, is defined to be, "A psychological disorder characterized by the repeated fabrication or causation of disease symptoms or trauma for the purpose of gaining medical attention or treatment." http://www.thefreedictionary.com/factitious+disorder

"without defensiveness" that she was experiencing pseudoseizures.[3]  Tr. 345.  At a March 2008

therapy session, she informed her counselor that her seizures were actually pseudoseizures as a

result of her mental health problems.  In April 2008, her doctor informed DMV, at Merriam's

request, that she did not have a seizure disorder and was no longer taking anti-seizure

medications.  In July 2008, she expressed comfort with the theory of pseudoseizures to her new

phsycian, James Hoyne, D.O., stating that she thought the seizures might be caused by her

bipolar disorder.  She separately noted in a therapy session that month that she believed playing

videogames affected her seizure disorder.  The next month, she reported doing very well on

Seroquel, which evened out her moods.

Around this time, Frank Lahman, Ph.D., a non-examining agency consultant, reviewed

the medical records and concluded Merriam had depression and anxiety, as well as a history of

polysubstance abuse and current use of cannabis.  He believed she exhibited mild restrictions in

her daily living activities, moderate difficulties in maintaining social functioning, and moderate

difficulties in maintaining concentration, persistence or pace.  He recommended Merriam be

limited to simple tasks and limited public, coworker and supervisor interactions.

In a physical examination performed by Kurt Brewster, M.D., in September 2008,

Merriam reported a seizure disorder since 14 months of age, with treatment since 1998.  She

reported a head injury in a 2004 car accident, after which her "seizures went out of control."  Tr.

353.  She reported her doctor took her off her anti-seizure medication in 2007, reporting that her

---

[3]Pseudoseizure is defined to be "an attack resembling an epileptic seizure but having
purely psychological causes, lacking the electroencephalographic changes of epilepsy, and
sometimes able to be stopped by an act of will."
http://medical-dictionary.thefreedictionary.com/pseudoseizure.

doctor "didn't believe I needed it."  Tr. 354.  She reported she left her last job because of her

seizures.  After assessing her physical abilities, Dr. Brewster concluded Merriam could walk

about six hours in an eight-hour day, had no restrictions on sitting, and could lift 20 pounds

occasionally and ten pounds frequently.

Judith Eckstein, Ph.D., performed a psychodiagnostic evaluation on Merriam in

September 2008.  Merriam reported taking Seroquel, which improved her mood and made her

feel for the first time "somewhat normal since I was a kid."  Tr. 367.  She reported having

obsessive thoughts, worrying, and having panic attacks, and described a history of being both the

victim and the perpetrator of violence.  She reported she left her last job because of the pain from

her 2004 car accident.  Dr. Eckstein noted that Merriam appeared to be benefitting from "the

proper use of psychotropic medications to help deal with her emotional volatility and agitation."

Tr. 368.  She diagnosed Merriam with Posttraumatic Stress Disorder, Intermittent Explosive

Disorder (Improved with Medication), Personality Disorder NOS with Paranoid and Obsessive-

Compulsive Traits, as well as a history of seizures and pseudo-seizures, COPD, asthma,

bronchitis, hypertension and restless leg syndrome.  She assigned a Global Assessment of

Functioning ("GAF") of 50.[4]

In a closing report from Douglas County Mental Health Center on January 28, 2009,

Merriam's therapist reported that she was "participating through DHS in a field placement at

UCAN.  She indicated that her mood symptoms were stable through medication management by

---

[4]The GAF is a scale from 1-100, in ten point increments, that is used by clinicians to determine the individual's overall functioning. A GAF of 41 to 50 means "**Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job)."  DSM-IV 34.

PCP and skills learned and was hoping to be able to secure employment through UCAN.

Continues to have physical problems with neuropathy.  Mental health issues are expected to be

ongoing but hopefully can be maintained."  Tr. 505.  Merriam's "prognosis is fair, provided that

medication management through PCP is able to maintain stability of symptoms."  Id.  At

discharge, her primary diagnoses were bipolar disorder with psychotic features and PTSD.  At

admission, rather than bipolar disorder, she had been diagnosed with major depression.  Her

therapist reported she was not employed, but seeking work, and that she was "employable."  Tr.

507.

In March 2009, Merriam was diagnosed with left ulnar neuropathy, as a result of

numbness in her left little and ring fingers.  She was counseled about breaking her habit of

spending her day with her elbow flexed and pressure on her elbows.

Later that month, Merriam again sought treatment for a seizure, reporting that it had been

about one year since her last one.  Dr. Hoyne noted the diagnosis of pseudoseizures and her

stable vital signs.  He educated her on pseudoseizures and Merriam declined a neurological

referral.

On January 9, 2010, Dr. Eckstein completed a Mental Residual Functional Capacity form

for Merriam, based on her 2008 evaluation.  She opined that Merriam was moderately limited in

her ability to understand and remember detailed instructions, but was markedly limited in her

ability to carry out detailed instructions and maintain attention and concentration.  She was

moderately limited in performing activities within a schedule, and markedly limited in her ability

to sustain an ordinary routine without supervision.  She was markedly limited in her ability to

work with or around others and to complete a normal workday and workweek without

interruptions due to psychological problems.  She was markedly limited in her ability to interact

with the general public and to accept instruction.  She was moderately limited in her ability to

respond to changes in the work setting, take precautions of normal hazards, travel to unfamiliar

places, and set realistic goals without help from others.

Additionally, on May 4, 2010, Dr. Eckstein responded to the ALJ's unfavorable decision.

Dr. Eckstein reported Merriam continued to take psychotropic medications to stabilize her mood,

which she said helps with her "loudness and boisterousness."  Tr. 675.  Merriam had left her

position at UCAN, where she had volunteered from November 2008 to June 2009, because she

felt "they were very disrespectful to me" when they did not use a project on which she had been

working.  She continued to smoke marijuana two or three times a day, even though she no longer

had a medical marijuana card, as it helped with her appetite when she was in a manic phase.  She

still had periods of sleeplessness and racing thoughts, and she described herself as being short-

tempered frequently.  She continued to experience depression and that she does not have much

purpose in life.  She reported paranoid ideation, although not as strong as in the past.  Dr.

Eckstein continued to diagnose PTSD, Bipolar II Disorder, Intermittent Explosive Disorder (by

History), Panic Disorder with Agoraphobia, Personality Disorder NOS with Paranoid and

Obsessive-Compulsive Traits, and again assessed a GAF of 50.  After recognizing that the

medication was perhaps controlling Merriam's aggressive outbursts, Dr. Eckstein nevertheless

opined that Merriam was "likely to exhibit increased anxiety symptoms as well as angry

outbursts even with co-worker contact limited to work-related issues."  Tr. 676.

**DISCUSSION**

Merriam challenges the ALJ's decision for failing to give:  (1) clear and convincing

reasons for rejecting her testimony; (2) germane reasons for rejecting the lay witness testimony;

(3) clear and convincing reasons for rejecting Dr. Eckstein's evaluations; and (4) reasons for

finding she could perform "other work" in the national economy.

I.      Merriam's Credibility

The ALJ gave Merriam's testimony regarding the intensity, persistence and limiting

effects of her symptoms little weight for several reasons.  The ALJ first noted Merriam's

repeated inconsistent statements:  she reported treatment for seizures as a child, and then that her

seizures started as an adult; she presented to the ER to "demonstrate her need for continued

disability," contending she was experiencing a seizure, but the physician noted no symptoms

consistent with seizures; she reported she had been driven to the ER, but treating providers

watched her drive herself away.  Additionally, the ALJ noted Merriam's continued cigarette and

marijuana smoking, while suffering from asthma, against medical advice.  Merriam reported

attending counseling at Douglas County Mental Health for almost a year, but she called to cancel

her appointments more often than she attended.  She asserted a seizure disorder as a reason for

her inability to work, but she was actually diagnosed with pseudoseizures.  Finally, she testified

to having some form of bipolar or depression since her teenage years, but her previous jobs did

not end as a result of those impairments.

Merriam concedes that "there are some inconsistencies in her reporting[.]"  Pl.'s Br. 18.

She also agrees that she canceled counseling sessions "a few times," but asserts her treatment

"was not insignificant." Id. She also argues that the ALJ failed to acknowledge that pseudoseizures are not volitional and are indicative of psychological problems.

When deciding whether to accept the subjective symptom testimony of a claimant, the ALJ must perform a two-stage analysis. In the first stage, the claimant must produce objective medical evidence of one or more impairments which could reasonably be expected to produce some degree of symptom. Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007). The claimant is not required to show that the impairment could reasonably be expected to cause the severity of the symptom, but only to show that it could reasonably have caused some degree of the symptom. In the second stage of the analysis, the ALJ must assess the credibility of the claimant's testimony regarding the severity of the symptoms. Id. The ALJ "must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony." Holohan v. Massanari, 246 F.3d 1195, 1208 (9th Cir. 2001). General findings are insufficient to support an adverse credibility determination and the ALJ must rely on substantial evidence. Id. Additionally,

> The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing.

Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (internal quotations and citations omitted).

The ALJ identified clear and convincing reasons to find Merriam less than credible given her repeated inconsistent statements, the fact that she canceled her therapy sessions (35 sessions)

more often than she attended them (22 sessions), thereby undermining her prescribed course of

treatment, and that she claimed a seizure disorder as a reason for her inability to work without

revealing that the diagnosis was actually pseudoseizures.  Tonapetyan v. Halter, 242 F.3d 1144,

1148 (9th Cir. 2001) (a tendency to exaggerate symptoms is a valid reason to support a negative

credibility finding); Tommasetti, 533 F.3d at 1039 (failure to follow course of treatment a

credibility factor).

Merriam suggests that the ALJ failed to adequately consider the diagnosis of Factitious

Disorder, which she says is the reason for her inconsistent statements.  As an initial matter, the

diagnosis came up on only one occasion by one physician, and the doctor did not repeat the

diagnosis when he saw her the next month.  Additionally, the disorder would not account for

inconsistent statements about her history only exaggerations as to her symptoms.[5]  The ALJ did

not err.

II.    Lay Testimony

Merriam's mother testified at the hearing that Merriam worked for her at the hotel, that

Merriam missed a lot of work after her car accident, that she was meticulous in her work, that she

argued with coworkers, that she hid in her room for one to three days after a manic phase at least

once every two weeks, that she had trouble concentrating on one task, and that Merriam left the

motel because other employees believed Merriam's mother was "playing favorites" and because

her mother was helping Merriam finish tasks.  Tr. 54.  Merriam's mother believed that Merriam's

---

[5]Merriam made multiple other inconsistent statements not identified by the ALJ, such as
that she was hit in the face in her 2004 car accident and that she left the motel due to seizures.

condition worsened after the car accident that "[s]he started having seizures that she never had

before.  You know, and blackouts.  And then her personality just started changing."  Tr. 55.

> The ALJ found as follows:

> The claimant's mother testified that the claimant had worked for her previously
> but had to be let go because she could not maintain a satisfactory pace.  The
> claimant's mother related this problem to the claimant's 2004 motor vehicle
> accident; however, she remained in this job until May 2006.  The dates involved
> are inconsistent with the alleged cause.  Moreover, the claimant and her mother
> asserted that the motor vehicle accident had increased the frequency of her
> seizures, which is why she could not perform adequately.  As discussed above, the
> 2004 motor vehicle accident did not involve a head injury and there is no
> reasonable explanation for how it could have exacerbated her seizures.  I do not
> accept this portion of the witness's statement as credible for these reasons.  The
> claimant's mother also testified that she had to mediate several disputes between
> the claimant and other employees.  The witness admitted that many of these were
> the result of favoritism she showed the claimant.  I find that there is sufficient
> support to conclude that the claimant would have difficulty interacting with
> coworkers and therefore accept these allegations as generally credible.

Tr. 19.  The ALJ concluded the RFC he crafted accounted for any credible limitations identified

by the lay witness.

Lay testimony about a claimant's symptoms is competent evidence which the ALJ must

take into account unless he gives reasons for the rejection that are germane to each witness.

Stout v. Commissioner of Soc. Sec. Admin., 454 F.3d 1050, 1053 (9th Cir. 2006).

Merriam suggests that the ALJ found her mother's testimony to be generally credible, and

that, as a result, the ALJ's failure to address all of the limitations identified by her mother was

error.

As an initial matter, the ALJ only gave some credit to Merriam's mother's testimony, but

otherwise found the majority of the testimony unpersuasive.  The germane reason the ALJ gave

was that, despite Merriam's mother's testimony to the contrary, the car accident had no

connection with Merriam's psychological difficulties.  Additionally, the ALJ accounted for many of the problems identified by Merriam's mother in the RFC.  First, and most importantly, he concluded Merriam could not perform her past work as a motel desk clerk.  Furthermore, because Merriam could not complete tasks at the motel without the help of her mother, Merriam was limited to performing simple, repetitive tasks.  Her emotional condition was accounted for by the limitation to unskilled work in an environment with minimal changes, and limited contact with the general public, coworkers, and supervisors.  The record amply supports the ALJ's reasoning for only partially accepting Merriam's mother's testimony, and the remainder of her testimony is consistent with the RFC.

III.    Dr. Eckstein's Evaluations

The ALJ gave "almost no weight" to Dr. Eckstein's 2010 functional assessment of Merriam.  The functional assessment was based on Dr. Eckstein's examination of Merriam two years earlier.  At that time, she diagnosed Merriam with PTSD, intermittent explosive disorder, and personality disorder NOS with paranoid and OCD traits.  The ALJ opined that the 2010 functional assessment was not supported by the 2008 examination, that the 2008 examination itself was significantly reliant on Merriam's suspect reports, that Dr. Owens spent more time with Merriam and administered formal testing, and that the State agency psychological consultants' findings were most consistent with the record.  The ALJ commented that Dr. Eckstein and Dr. Owens came up with different diagnoses and limitations, but that the consistencies between the two opinions were reflected in the RFC.

The weight given to the opinion of a physician depends on whether the physician is a treating physician, an examining physician, or a nonexamining physician.  More weight is given

to the opinion of a treating physician because the person has a greater opportunity to know and observe the patient as an individual.  Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007).  If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons.  Id. (treating physician); Widmark v. Barnhart, 454 F.3d 1063, 1067 (9th Cir. 2006) (examining physician).  Even if it is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record.  Orn, 495 F.3d at 632; Widmark, 454 F.3d at 1066.

Merriam contends that in order to reject Dr. Eckstein's opinion, the ALJ was required to provide clear and convincing reasons.  The Commissioner suggests the ALJ's reasoning was "specific, legitimate, clear and convincing[.]"  Def.'s Br. 8, 9.

Since Dr. Eckstein's opinion was contradicted by Dr. Lahman, the agency's medical consultant, the ALJ was required to give specific and legitimate reasons for rejecting Dr. Eckstein's opinion.  Widmark 454 F.3d 1063, 1066-67 (9th Cir. 2006) (state agency consultant's opinion can constitute the conflicting opinion triggering the lower specific and legitimate standard, although the opinion alone cannot constitute "substantial evidence" for rejecting an examining physician's opinion).  Specifically, while Dr. Eckstein found Merriam markedly limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, and sustain an ordinary routine, Dr. Lahman found her only moderately or not significantly limited in those categories.  Similarly, while Dr. Eckstein found Merriam markedly limited in her ability to interact with the general public and accept criticism from supervisors, Dr.

Lahman found her only moderately limited.  As a result, the ALJ was required to give specific

and legitimate reasons for rejecting Dr. Eckstein's opinion.

With respect to concentration, persistence, and pace, since Dr. Eckstein herself

specifically referred to Dr. Owens' testing as "more conclusive" and "a better indicator of

[Merriam's] ongoing mental functioning," the ALJ's conclusion that Dr. Owens' opinion, and

the consistent opinion of Dr. Lahman, was entitled to more weight is a specific and legitimate

reason to reject Dr. Eckstein's opinion.  Tr. 368.  Dr. Owens found Merriam only mildly limited

in her ability to maintain attention and concentration for extended periods, and Dr. Lahman

found her only moderately limited in this category.  Furthermore, Dr. Eckstein based her 2010

opinion on Merriam's statements, made two years earlier, that she experienced difficulty with

concentration and short-term memory, but the ALJ properly discounted Merriam's statements;

this is a specific and legitimate reason to reject Dr. Eckstein's opinion.  Tommasetti, 533 F.3d at

1041 (A physician's opinion of disability may be rejected if it is "based to a large extent on a

claimant's self-reports that have been properly discounted as incredible.").

Additionally, Dr. Eckstein's behavioral observations do not support her conclusion that

Merriam was markedly limited in her ability to interact with the general public or respond to

criticism from a supervisor.  For example, Dr. Eckstein noted Merriam was prompt, cooperative,

made appropriate eye contact, and had logical and coherent thought processes.  She noted

Merriam's speech was "rather rushed and accelerated" and that she "appeared somewhat

agitated[,]" but also that she "demonstrated no overt signs of distress."  Tr. 366.  Furthermore,

Merriam's mood had improved on Seroquel and she considered herself to be "a pretty happy

person."  Tr. 366-67.  Indeed, Dr. Eckstein found Merriam's mental status to be free from

Page 19 - OPINION AND ORDER

significant problems.  An ALJ is not required to accept the opinion of a physician if the opinion is "brief, conclusory, and inadequately supported by clinical findings."  Batson, 359 F.3d at 1195.

Merriam makes much of Dr. Owens' conclusion that her ability to respond appropriately to co-workers, supervisors and the public is moderately *to markedly* impaired, suggesting that Dr. Owens' conclusion is not so different from Dr. Eckstein's.  I note, however, that Dr. Owens separately found Merriam's ability to relate in her interpersonal relationships was moderately to markedly impaired, but that she had only "mild difficulty interacting with her world and maintaining social functioning."  Tr. 669.  This latter conclusion supports the ALJ's opinion that Merriam could perform work if she had limited contact with the general public and restricted contact with co-workers and supervisors to work-related issues.  Further support is found in Dr. Lahman's opinion, relying on Dr. Owens' findings, that Merriam could perform work if her contact with the general public, coworkers and supervisors was limited, even with moderate difficulties interacting with the general public and getting along with coworkers.

Merriam argues that Social Security Ruling 85-15 directs a finding of disability because even if Merriam exhibited these marked limitations only part of the time, she could not work.  Social Security Ruling 85-15 provides that a "substantial loss" in the ability to "respond appropriately to supervision, coworkers, and usual work situations" would justify a finding of disability because it would "severely limit the potential occupational base."  SSR 85-15, at *4.  The ALJ, however, translated Dr. Owens' opinion of moderate to marked impairment interacting with the general public, supervisors, and co-workers, and mild impairment interacting with her world and maintaining social functioning, into an RFC of limited contact with the general public, and restrictions on her contact with co-workers and supervisors; the RFC is consistent with Dr.

Owens' opinion.  Turner v. Comm'r of Soc. Sec. Admin., 613 F.3d 1217, 1222-23 (9th Cir. 2010)

("marked limitations in social functioning" consistent with no public contact).  Further, such a

limitation does not constitute a "substantial loss" undermining the occupational base, because the

VE was able to identify three jobs that Merriam could perform with this RFC.

Merriam also finds it significant that Dr. Owens assessed a lower GAF (35) than did Dr.

Eckstein (50).  The GAF score is simply a way to sum up a clinician's overall estimation as to the

"psychological, social and occupational functioning of a patient."  Morgan v. Commissioner of

Soc. Sec. Admin., 169 F.3d 595, 598 n.1 (9th Cir. 1999).  As the Commissioner points out, it can

reflect non-job related considerations.  For example, Dr. Owens noted that Merriam's "greatest

current difficulty is physical pain and grieving the loss of her father, which she reported she has

not dealt with[.]"  Tr. 666.  The ALJ did not err in his reading of Dr. Owens' assessment and in

translating it into the RFC he crafted.

Finally, Merriam suggests the VE testified a restriction to co-worker and supervisor

contact regarding only "work-related issues" was unrealistic.  However, the VE specifically

accepted the ALJ's hypothetical, which included such a limitation, and offered several jobs he

believed Merriam could perform, including fruit sorter, stuffer, and small parts assembler.

Further, although the VE appears to have testified in a somewhat contradictory fashion that it

would be "unrealistic" to "only talk[] about work when they're in the work environment," the

ALJ did not craft an RFC precluding Merriam from talking about non-work related subjects.  Tr.

64.  Instead, the RFC targets those jobs where the bare minimum requirement is the ability to

interact with co-workers and supervisors on work-related matters.

The ALJ did not err in his treatment of Dr. Eckstein's assessment.

IV.    Performing Other Work

Merriam argues the ALJ did not meet his burden in showing she could perform other work.

I have rejected all of Merriam's arguments with respect to Dr. Eckstein, so I do not accept Merriam's request to credit the doctor's assessment.

Merriam suggests that the ALJ's RFC formulation did not adequately address Dr. Owens' finding of Merriam's "moderate to marked" difficulty responding to supervision, arguing that such a limitation would preclude work. As I indicated above, however, the ALJ's RFC properly accounted for Dr. Owen's opinion.

In addition, I find no legal error in the ALJ's conclusion that, for listing purposes, Merriam has moderate limitations in concentration, persistence or pace, but that she retained the capacity to perform simple repetitive tasks. Dr. Lahman, the agency consultant, found Merriam had moderate difficulties maintaining concentration and attention, but that she could perform simple tasks. Tr. 307. So long as the ALJ's decision is supported by medical evidence, a limitation to simple, repetitive work can account for moderate difficulties in concentration, persistence or pace. See Sabin v. Astrue, 337 Fed. App'x 617, 621 (9th Cir. 2009) (moderate concentration, persistence or pace difficulties consistent with medical evidence that claimant could perform simple and repetitive tasks); Howard v. Massanari, 255 F.3d 577, 582 (8th Cir. 2001) (limitation of often having deficiencies of concentration, persistence or pace which was interpreted by a doctor into a functional capacity assessment of being "able to sustain sufficient concentration and attention to perform at least simple, repetitive, and routine cognitive activity

without severe restriction of function" was adequately captured in a hypothetical for "someone who is capable of doing simple, repetitive, routine tasks").

Finally, Merriam suggests that the ALJ's hypothetical was defective because it did not include limitations associated with her ulnar neuropathy. However, after being diagnosed with ulnar neuropathy, Merriam agreed to treat the condition conservatively and she was able to continue using her left arm in lifting and moving furniture. Additionally, the ALJ limited her to carrying 20 pounds occasionally and ten pounds frequently. Merriam does not argue these functional limitations are insufficient to address the condition.

I conclude that the ALJ met his burden of showing Merriam retained the functional capacity to perform other work in the national economy.

## CONCLUSION

The findings of the Commissioner are based upon substantial evidence in the record and the correct legal standards. For these reasons, the court affirms the decision of the Commissioner.

IT IS SO ORDERED.

Dated this _____23rd_____ day of February, 2012.


_/s/ Garr M. King_____
Garr M. King
United States District Judge